# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

   vs.

NAEL ALI,

        Defendant.

**Case No. 1:15-cr-3762-JCH**

### UNITED STATES' RESPONSE TO DEFENDANT NAEL ALI'S
### FORMAL OBJECTIONS TO PRESENTENCE REPORT (DOC. 115)
### AND SENTENCING MEMORANDUM

The United States files this sentencing memorandum in response to Defendant Nael Ali's "Formal Objections to Presentence Report," Doc. 111, and in support of an 18-month sentence.

On October 18, 2017, Ali pleaded guilty for fraudulently selling, offering, and displaying imported jewelry as genuine Native American jewelry, pursuant to two counts of 18 U.S.C. § 1159. He swore under oath to a detailed, three-page factual basis describing his fraudulent scheme to buy imported jewelry, "stock[] that jewelry in a manner falsely suggesting it was Indian made, provide[] lists for [his] employees to reference the symbols and initials to falsely suggest the jewelry was Indian made, and train[] the employees to tell customers the jewelry was Native American-made and to reference the fraudulent list that [he] created." Doc. 102 at 4-6. Nonetheless, Ali now asks this Court to believe that (1) his stores did not "'specialize' in the sale of Native American jewelry and pottery," Doc. 115 at 1; (2) he did not tell an undercover officer "ALL [the] jewelry [in his Arizona store] was Native-made,; *id.* at 2; and (3) he "has always asserted that while some of the product was Native-made, most of the product is southwest in style," *id.* The United States urges this Court to reject Ali's attempt to minimize, shade, and

negate the full measure of his culpability. This Court should adopt the well-researched pre-sentence report, deny Ali's formal objections to that report, and sentence him to 18 months incarceration, a sentence at the bottom of Ali's applicable sentencing guidelines.

## I.       Background of the Indian Arts and Crafts Act

On August 27, 1935, Congress created the Indian Arts and Crafts Board (IACB) to improve the economic status of Native Americans through the development and promotion of authentic Native American arts and crafts. 49 Stat. 891; 25 U.S.C. §§ 1158-1159. The 1935 Act adopted criminal penalties for selling items misrepresented as Native American made. This provision, which set fines not to exceed $500 or imprisonment not to exceed six months, or both, proved to be ineffective at stemming the flood of counterfeit Native American arts and crafts in the market.

In response to growing sales of counterfeit Native American arts and crafts that negatively impact the sale of authentic Native American products, Congress passed the Indian Arts and Crafts Act (IACA) of 1990, P.L. 101-644 (Act). Today, these counterfeits include a glut of overseas knock-offs and severely undercut Native American economies, self-determination, cultural heritage, and the future of an original American treasure. The IACA is designed as a truth-in-advertising law meant to punish individuals who falsely market products as "Indian Made" when the products are not, in fact, made by Indians as defined by the Act.  The relevant criminal portion of the Act reads as follows:

(a)  It is unlawful to offer or display for sale or sell any good, with or without a Government trademark, in a manner that falsely suggests it is Indian produced, an Indian product, or the product of a particular Indian or Indian tribe or Indian arts and crafts organization, resident within the United States.

Subsequently, the Indian Arts and Crafts Amendments Act of 2010, P.L. 111-211, allowed the IACB to refer cases to any federal law enforcement officer for investigation. In response to the scourge of counterfeit Native American arts and craft products, IACB entered into a Memorandum of Agreement with the United States Fish and Wildlife, Office of Law Enforcement in 2012 to develop an investigative unit to pursue violations of IACA.

## II.    *Background of the Investigation*

As part of the Memorandum of Agreement between USFWS and the IACB, in April of 2012, Special Agent Russell Stanford initiated an investigation into the importation and subsequent sale of Native American-style jewelry in violation of 18 U.S.C. §1159(a). The following are SA Stanford's findings with respect to Sterling Islands, Inc. ("Sterling").

Sterling, is an Albuquerque-based import company that was originally registered as a Virginia corporation. Sterling purchased jewelry from its sister manufacturer corporation in the Philippines, Fashion Accessories 4 U, Inc. ("FA4U"), owned and operated by the same family as Sterling and registered with the Philippines Securities and Exchange Commission. From approximately 2010 until late 2015, Sterling declared to USFWS, upon importation from FA4U, 298 shipments of jewelry with a total declared value of approximately $11.8 million in imported jewelry. An examination of Sterling's financial records over nearly the same time period revealed **$6,355,599.89** in payments from Sterling to FA4U from June 18, 2010 to July 17, 2014. The payments were made by international wire transfer drawn on a Sterling account with Bank of America to the FA4U Philippine account held with the Metropolitan Bank and Trust.

In addition to reviewing the importation paperwork and declarations, USFWS agents and inspectors intercepted and covertly inspected five separate shipments. Upon inspection, these intercepted shipments were to found to contain Native American-style jewelry consistent with what agents have observed for sale and purchased as genuine Native American jewelry at retail stores across New Mexico. In some instances the jewelry was covertly marked by USFWS agents with ultraviolet-visible ink for later identification. Based on the results of those inspections and SA Stanford's review of all Sterling's USFWS import declarations, SA Stanford inferred that all of the import declarations claim similar products consistent with the importation of Native American-style jewelry.

The inspection of Sterling's FA4U imports also revealed another important fact. Not a single piece of jewelry was indelibly marked with its country of origin as required by law.  *See* 19 U.S.C. §1304; 19 C.F.R. § 134.43. In fact, all of the imported jewelry inspected by USFWS, which was indelibly stamped with various initials and Native American-style symbols, was placed inside plastic bags outfitted with "Made in Philippines" decals. Without an indelible marking, the jewelry can be easily separated from the plastic bags to make it impossible for an unsuspecting consumer to determine the jewelry's country of origin.

SA Stanford's financial investigation of Sterling uncovered dozens of retail stores purchasing the Filipino-made, Native American-style jewelry. Moreover, an analysis of Sterling's bank account by an FBI financial analyst concludes that the majority of the 9.3 million dollars that has flowed into Sterling's account from October 1, 2010 to July 31, 2014 is directly related to the sale of jewelry. Naturally, SA Stanford visited many of those retail stores to determine how the jewelry was being sold to the public. SA Stanford covertly recorded and documented over a dozen purchases of the FA4U jewelry, which were being misrepresented as Native-American jewelry, at nine retail stores, including three of Nael Ali's stores. One of SA Stanford purchases from an Ali-owned store included the recovery of a piece of jewelry that was covertly marked with ultraviolet-visible ink during a USFWS import inspection.

### III.     Overview of the Sterling Islands, Inc. Supply Chain

The case against Defendants Nael Ali and Mohammad Manasra relates to the investigation of Sterling, as well as I.J. Wholesale, Inc. ("IJW"), detailed further below. Sterling worked in concert with Filipino corporation FA4U to design, import, and supply Sterling's Filipino-made jewelry to jewelry stores across New Mexico that would fraudulently sell the jewelry as Native American-made in violation of the Indian Arts and Crafts Act ("IACA"), 18 U.S.C. § 1159. Since 2010, Sterling imported approximately 11 million dollars' worth of Native American-style jewelry manufactured by FA4U. The 11 million dollars is the declared value of FA4U's imports from nearly 300 separate shipments into the United States. The Sterling supply chain is represented by the diagram on the following page.



### IV.    Overview of the IJ Wholesale, Inc. Supply Chain

From February of 2015 until October 28, 2015, USFWS and our office engaged in a covert investigation of IJW's supply chain, which revealed the following:  (1) IJW was operated by the Aysheh family; (2) the Aysheh family manufactured counterfeit Native American jewelry in the Philippines through its Philippines-registered business, Imad's Jewelry, which was owned and operated by Imad Aysheh; (3) the Aysheh family imported the counterfeit jewelry into the United States through its importer I J Wholesale Inc, which was owned and operated by Iyad Aysheh; (4) the Aysheh family used Golden Bear, a California-based jewelry store owned and operated by Raed Aysheh, as its distribution hub and retail store to the public, and (5) the Aysheh family distributed its counterfeit jewelry wholesale throughout the United States to both family and non-family members, including Albuquerque Old Town stores owned and operated by Nael Ali (Gallery 8 and Galleria Azul).  A diagram of the Aysheh Organization follows.



### V.    *The Case Against Defendants Nael Ali* **and** *Mohammad Manasra*

Mr. Ali and Mr. Manasra served as both retailers and wholesalers of Sterling's counterfeit jewelry. Mr. Ali operated two stores in Albuquerque's old town, Gallery 8 and Galleria Azul, as well previously operated a store in Scottsdale, Arizona.  Mr. Ali's stores specialized in the sale of Native American jewelry and pottery. Mr. Manasra operated from the Albuquerque flea market but represented himself as a mobile nationwide wholesaler of Native American jewelry from his cargo van.

Mr. Ali heavily invested in Sterling jewelry.  He purchased over $100,000 worth of Sterling imported jewelry from approximately 2010 until 2015, directly from Sterling and through Mr. Manasra and his associates. In 2015, Mr. Ali also purchased a large amount of IJW jewelry for display and sale at his Albuquerque stores. For his part, Mr. Manasra had been selling Sterling-imported jewelry at the Albuquerque Flea Market for many years.  He claims to have sold jewelry at the flea market and in Santa Fe for over twenty years.

For more than a decade, Mr. Ali has owned and operated three retail stores in New Mexico and Arizona that specialized in the sale of Native American jewelry.  The layout, merchandise and displays of his stores were covertly recorded by video. Financial records, in-store observations, undercover sales and careful comparison to photographs of Sterling's imports

all confirmed that Ali's jewelry supply was largely comprised of Sterling- and IJW-imported jewelry. And while many of the documented sales in New Mexico were made by Ali's employees, it is apparent based on his factual basis, and his employees' representations and debriefs that they were specifically directed by Mr. Ali.

### A. 2011 Fraudulent Sale to R.A. and G.W. of Turquoise Canyon

In the spring of 2011, the owners of Turquoise Canyon, an Indian jewelry store in Virginia, travelled across the Southwest to purchase and stock their store with Indian jewelry. On April 9, 2011, at the tail end of their trip, owners R.A. and G.W. walked into Gallery 8 in Albuquerque, NM. Ali sold $13,000 of what he claimed was Indian (largely Navajo) jewelry. The owners paid $10,000 in check and $3,100 in credit card for 166 pieces of jewelry. Mr. Ali later shipped the lot to their stores UPS box, 2961 Hunter Mill Road #814, Oakton, VA 22124. Agent Stanford located the credit card receipt, the invoice and the check credit card service deposits into Gallery 8's bank account. The Turquoise Canyon owners provided affidavits about Ali's sale and representations, as well as comprehensive photographs and details on each piece of jewelry, which they used to advertise the jewelry at their store and through their website. Agent Stanford analyzed all of the pieces and conservatively determined that at least 69 of the items purchased by Turquoise Canyon were Filipino-made and imported by Sterling Islands. Prior to the sale, Ali made regular payments to Sterling Islands and Mr. Manasra by check.

### B. November 26, 2012—Undercover Buy at Gallery 8 in Old Town Albuquerque

On November 26, 2012, SA Stanford visited Gallery 8 in Old Town Albuquerque. He was told by S.S., a store employee,[1] that everything in the store was Indian made except the

---

[1] Agent Stanford conducted interviews of many of Mr. Ali's former and current employees. Those employees consistently described Mr. Ali's training for new hires: (1) tell customers that all the jewelry in the store was Native American (with the exception of a standalone case of imported amber jewelry); and (2) if pressed for the tribe or artist, use the sheet he provided for the corresponding initials or call him directly. Those employee descriptions are corroborated by Agent Stanford's own undercover experience in the store.

amber jewelry. SA Stanford observed and purchased two rings stamped "CK" that were identical to the rings he had covertly marked with ultraviolet-visible ink during his inspection of a Sterling shipment on September 10, 2012, as documented in photographs below.



Sterling Import



Ultraviolet ink visible under exposure to black light

S.S. represented to SA Stanford that the rings were Navajo made. After purchasing the items, SA Stanford confirmed that the rings were, in fact, rings from the September 10, 2012 Sterling shipment by exposing them to ultraviolet light and confirming the presence of ultraviolet visible ink.

### C.   November 30, 2012—Undercover Contact at Gallery 8 and Galleria Azul 8 in Old Town Albuquerque

On November 30, 2012, SA Stanford visited both Gallery 8 and Galleria Azul in a covert manner.  He observed many of the Sterling-imported items displayed for sale in Galleria Azul that were displayed in Gallery 8.  SA Stanford purchased a ring from employee, A.B., who represented that the ring was Navajo made.



Galleria Azul ring consistent with Sterling Import



Galleria Azul ring - "OY" Initials same as Sterling Import



Photograph taken during Sterling shipment inspection in Louisville, KY

Photograph taken during Sterling shipment inspection in Louisville, KY "OY" initials same as Galleria Azul ring



The employee also informed SA Stanford that Gallery 8 and Galleria Azul are owned by the same person and interchange merchandise.  SA Stanford later compared the ring to photos taken of the

Sterling shipments and confirmed the match.

> **D.  February 26, 2014—Undercover Contact at Gallery 8 and Galleria Azul in Old Town Albuquerque**

On February 26, 2014, SA Stanford and another agent visited Gallery 8 and Galleria Azul in a covert manner and spoke to the manager, C.B., while at Gallery 8. C.B. represented that all of the jewelry in the store was Navajo-made with the exception of three Zuni-made pieces. SA Stanford asked C.B. if he could purchase more rings like the "CK" stamped ring he purchased previously. C.B. stated that she would have Ali contact "Calvin Kee" to see about getting more jewelry. C.B. continued to tell SA Stanford that "Calvin Kee" is supposed to exclusively supply Gallery 8 with his jewelry. Finally, C.B. said she would call Ali to determine final pricing on the jewelry.

At Galleria Azul, another USFWS SA requested a list of artists corresponding to the stamped initials. The employee, T.M., replied that she had a list and could make a copy.  T.M. later, while the agents were at Gallery 8, gave the agents a copy of a list with initials and corresponding artists' names. Additionally, T.M. and C.B. provided corresponding artists' names for many of the Native American-style symbols stamped on the jewelry. T.M. also made the following statements during the encounter:

- o  "Sometimes I forget and make stuff up. I know that's bad."
- o  "We make it up. I'm not gonna lie ... You guys are in the business, you have to understand."  (**Agent's Note**:  This statement was made in response to the SA's question about what they do when artists have the same initials.)
- o  "It is all handmade . . . I'm not lying about that . . ."
- o  "It's all locally made."

Regarding the Calvin Kee ring request, C.B. told SA Stanford that she spoke to Ali and she would take a photograph of his "Calvin Kee" ring and have more made. C.B. called Ali using the wireless telephone in the store. After making the call, C.B. told SA Stanford that Ali said he would get in touch with the artist, "Calvin Kee." C.B. then took photographs of the ring, using her cell phone, to show to Ali. SA Stanford ordered twenty Calvin Kee rings like the one the manager photographed. C.B. said that it would take at least three weeks for Calvin Kee to produce the rings.

SA Stanford then purchased five rings with "CK" initials, one ring with a Yucca symbol, one ring with "NB" initials, one ring with "OY" initials, three rings with raincloud symbols, and

one ring with a feather symbol for $1116. Each of the purchased pieces of jewelry was represented as Navajo or made by a particular Navajo artist. Finally, C.B. reported that the owner had a third store, Galleria Azul, in Scottsdale, Arizona.

### E.  April 2, 2014—Follow-up Regarding "Calvin Kee" Rings from Gallery 8

On April 2, 2014, a USFWS SA contacted C.B. at Gallery 8 via telephone. The SA inquired about the status of the rings that were ordered on February 26, 2014.  C.B. told the SA that the rings were still being produced and that she did not want to rush the artist or interfere with the production of a high quality product.

### F.  May 29, 2014—Undercover Buy at Galleria Azul in Scottsdale, Arizona

On May 29, 2014, SA Stanford visited Ali's third store, Galleria Azul in Scottsdale, Arizona, in a covert manner.  He met Ali and observed Sterling-imported jewelry offered for sale in the store.  SA Stanford referenced his order for "Calvin Kee" rings at the Albuquerque store. Ali immediately knew what SA Stanford was referring to and said he had more "Calvin Kee" rings for sale.  He also represented that the order of rings had arrived a week ago and were currently at his Albuquerque store.  Ali claimed that all of the jewelry in his store is Native made.  Ultimately, SA Stanford purchased a ring from Ali consistent with Sterling's imports that Ali represented as Navajo.

Ali also boasted to SA Stanford about supplying jewelry to the Oneida tribe in upstate New York.  He claimed to have helped them establish a gallery and supply them with jewelry for a Native-American themed festival in Germany.

### G.  May 31, 2014—Undercover Buy of Calvin Kee rings at Gallery 8 in Old Town Albuquerque

On May 31, 2014, SA Stanford visited Gallery 8 in Albuquerque, in a covert manner.  C.B. told SA Stanford that Ali got in touch with the artist and that "Calvin Kee" made the twenty ordered rings but that he couldn't make them all in brown (the color of the original ring to be copied for the order) so that some were made in black. C.B. told SA Stanford that each ring retails for $270 but that she would sell them for $90. SA Stanford paid $1800 for the rings by credit card.

### H.  Financial Investigation

An examination of financial records, from March 2011 to October 2014, reveal approximately $57,000 in payments from Nael Ali, d.b.a. Gallery 8/ Galleria Azul, to Sterling.  As Sterling is solely in the business of importing and subsequently selling their Filipino-made Native

American-style jewelry, it can be presumed that these payments were made for jewelry imported from FA4U. Those financial records, from January 2011 to October 2014, also reveal over $70,000 in payments from Ali's stores to Mohammad Manasra. Several similar payments were also made to Manasra's brother, Abdel Manasra over the same time period. But for the relevant time period charged in the proposed indictment, the majority of payments were made to Manasra.

One final fact of interest to be drawn from the financial records is that Ali's claim about supplying the Oneida tribe with jewelry appears to be true. On April 23, 2013, Ali was paid $28,085 by the Oneida tribe. And again on August 14, 2014, the Oneida Tribe paid Ali a large sum. This time $9,850. Open source queries by SA Stanford confirmed that the Oneida Nation participated in the Karl May Festival in Germany in the Spring of 2013 and 2014.

### I. Fraudulent Sales to F.B. and C.B. in 2013 and 2015

Agent Stanford determined that on October 30, 2013 and again on June 11, 2015, F.B. and C.B., out-of-state tourists from Florida, purchased rings from Gallery 8 for $117.70 and $160.50 by credit card. F.B. and C.B. were told by one of the employees that the rings were Native American made. Agent Stanford examined photographs of the jewelry sent by C.B. and determined that the rings were consistent with imports from Sterling.

### J. October 19, 2014—Undercover Buy with Mohammad Manasra at Albuquerque Flea Market

SA Stanford attended the Albuquerque Flea Market on October 19, 2014, and located a man subject selling jewelry consistent with Sterling's imports, who identified himself as "…Mohammad".  SA Stanford later identified the man through DMV registration records and photographs, as Mohammad Manasra. SA Stanford recognized several of the pieces sold by Manasra by their overall design, markings, and stamped initials, as consistent with Sterling imported jewelry.  Manasra had displayed and offered for sale well over $1,000 worth of jewelry consistent with Sterling imports. SA Stanford estimates that the extrapolated value of all the jewelry Manasra displays for sale at the flea market would be in the tens of thousands of dollars as he observed hundreds of jewelry pieces offered for sale at his booth.

During the covert contact, Manasra told SA Stanford that he was a Native American-jewelry wholesaler and had been in the business for over twenty years. Manasra claimed all of the jewelry on display was Native American made. Manasra also represented that he obtained all his jewelry from Gallup, NM. Manasra showed SA Stanford his cargo van that contained boxes

of jewelry in distinct packaging that SA Stanford recognized to be consistent with that imported by Sterling.

Ulitmately, SA Stanford purchased five pieces of jewelry for $500 that Manasra claimed to be Native American made. All of the purchased jewelry was consistent with that imported by Sterling Islands. And later SA Stanford compared and matched the pieces to inspection photographs. Furthermore, one of the pieces had a "Made in Philippines" decal attached to it. Manasra even represented that piece to be Native American-made.

### K.  October 2015 Fraudulent Display of Aysheh Jewelry by Nael Ali

During a covert visit just days before the execution of the search warrant at Mr. Ali's stores, Gallery 8 and Galleria Azul, agents identified the display of IJW imports in violation of the IACA. Those items were displayed similarly on the date of the execution of the search warrant. Agents seized approximately 1,000 pieces of the IJW imports on display and from Nael Ali's cargo van after receiving consent. Nael gave a detailed interview and admitted to purchasing the IJW imports from Iyad and Raed on two separate occasions. A subsequent search of the financial records revealed two check stubs written to Nedal Aysheh. Nael Ali explained that the Aysheh brothers used to operate a jewelry manufacturing business in Gallup and worked with Navajo artists, including Calvin Begay, but then moved overseas to the Philippines. Nael also claimed that he used to have a small jewelry manufacturing shop in Albuquerque, but he gave his equipment to one of the Aysheh's younger brothers.  Nael Ali disputed ever selling the IJW jewelry as Native American, and claimed that if that happened at his stores it was his employees' mistake or zeal to make a sale. That last claim is refuted by undercover recordings of Nael himself offering the jewelry for sale as "Native American" and "Navajo."

### I.  THE COURT SHOULD OVERRULE ALI'S OBJECTIONS TO THE PSR

### A.  The Presentence Report Appropriately Applied a Six-Level Adjustment Pursuant to USSG § 2B1.1(b)(1)(F) Given the Loss Amount in this Case Exceeds $150,000.

The PSR appropriately calculated the loss amount directly attributable to Ali as $190,452.56. In fact, that is a conservative estimate because we will never know exactly how many customers Ali defrauded over the four years he purchased Filipino-made jewelry and sold it as genuine Native American-jewelry.

SA Stanford's financial investigation revealed checks from Ali to Sterling for jewelry from March of 2011 until October 2014, totaling $56,964. Similarly, the financial investigation revealed Ali's payments via checks to Manasra for Sterling jewelry, totaling $85,369. Additionally, SA Stanford's financial investigation revealed checks from Ali to Manasra's brother Abdel Manasra for jewelry from June 2012 until January 2014, totaling $13,020. And finally, Ali purchased $80,000 of IJW jewelry from the Ayshehs, as evidenced by Ali's admissions, corroborated by two check stubs located during the search warrant, as well as the additional checks to the Ayshehs for IJW jewelry, totaling $4,580. All told, the investigation revealed that Ali purchased $239,927 of Native American-style jewelry made in and imported from the Philippines over a four-year period, from the beginning of 2011 until just before search warrants were executed in October of 2015.

We know from SA Stanford's purchase of the rings Ali fraudulently sold as "Calvin Kee," along with shipment inspection records and Sterling invoices, that Ali's mark-up was ten times the wholesale price. Thus, the Court would be justified in multiplying Ali's total wholesale price ($239,927) by the mark-up of 10 to reach a total intended loss of $2,399,270. Under USSG § 2B1.1(b)(1)(I), a loss amount exceeding $1,550,000 corresponds to an adjustment of 14 levels, not the 6 that the PSR writer conservatively applied. The Court, therefore, rests on solid footing in accepting the PSR's loss calculation of $190,452.56. And Ali himself does not dispute the PSR's $190,452.56 figure. Doc. 115 ("In fact, Mr. Ali may have purchased this amount in jewelry from two companies, Sterling Island and IJW . . . .").

Despite that concession, Ali argues that using the $190,452.56 figure as a loss under USSG §2B1.1(F) is erroneous for two reasons: (1) Ali argues that it is speculative to assume the entire $190,452.56 would have been sold in violation of the IACA; and (2) the United States

14

recovered much of that jewelry during the search and seizure. The Court should reject both arguments.

First, according to the Sentencing Commission Commentary for USSG §2B1.1, "loss is the greater of actual loss or intended loss." §2B1.1 Commentary at 3. Intended loss, of course, is loss that did not actually occur but rather "the pecuniary harm that the defendant purposely sought to inflict," including pecuniary harm that would have been impossible or unlikely to occur" due to "a government sting operation," or the like. *Id.* at 3(ii). Accordingly, that Ali had not yet sold the jewelry that was displayed in his store, or stored in his van, is immaterial. The investigative facts support that Ali intended to sell that jewelry consistent with the practice the investigation revealed and admitted by Ali in his factual basis. Moreover, the United States need not demonstrate that all of the $190,452.56 in Philippine-made jewelry was sold to the public by explicit misrepresentation. The IACA is broadly written and makes it "unlawful to offer or *display for sale* or sell any good, . . . in a manner that falsely suggests it is Indian produced, an Indian product, or the product of a particular Indian or Indian tribe or Indian arts and crafts organization, resident within the United States." 18 U.S.C. § 1159. Thus, Ali's intentional mixing of genuine Native American jewelry with the Philippine-imported jewelry, in a store marketed as specializing in Native American jewelry, without any notice to customers that the jewelry was imported, is all that is required.

Second, it is immaterial that the United States recovered a portion of the jewelry intended to be fraudulently sold during the execution of search warrants. Defendants are only credited for "money returned . . . by the defendant . . . to the victim before the offense was detected." USSG § 2B1.1, Commentary at 3(E)(i). Additionally, the Court is not to credit the defendant for the value of the fraudulent good. *See, e.g.*, *id.* at 3(F)(iv) ("loss shall not be reduced by the money or

the value of the property transferred"); and *id.* at 3(F)(v) ("loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services").

As a final note, the Sentencing Commission Commentary makes clear that the Court's estimate need only be reasonable and is entitled to deference.

> The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference. *See* 18 U.S.C. § 3742(e) and (f).

USSG § 2B1.1, Commentary at 3(C).

**B. The Court Should Reject Ali's Contentions that are Contradicted by the Investigation and Ali's Own Sworn Statements.**

Ali makes the following claims, which stray wildly from the objective record, to include his own sworn factual account: (1) his "stores do not 'specialize' in the sale of Native American jewelry and pottery. Nor did he ever claim to specialize," Doc. 115 at 1-2; he "does not recall that he claimed the jewelry was Navajo or that ALL of his product was Navajo made," *id.* at 2; he denies intentionally mixing the genuine jewelry with the imported jewelry, *id.*; and he appears to claim that his customers did not buy his jewelry because they believed it to be Native American, *id.* at 3.

On these points, the United States relies primarily on Ali's admissions in his plea agreement. There, he affirmed under oath the following:

> On February 26, 2014, I operated a store in old town Albuquerque, New Mexico, "Gallery 8," from which I sold Native American-style jewelry. . . . I knew that many of the pieces of Native American-style jewelry I displayed for sale were not made by Indians but rather made by laborers in the Philippines. Nonetheless, I mixed the Philippine-made jewelry with Indian-made jewelry, and I never labeled the Philippine-made jewelry with its country of origin.
> . . .

. . . I intentionally stocked that jewelry in a manner falsely suggesting it was Indian made, provided lists for the employees to reference the symbols and initials to falsely suggest the jewelry was Indian made, and trained the employees to tell customers the jewelry was Native-American-made and to reference the fraudulent list that I created.

. . .

. . . I intentionally mixed the Philippine-made jewelry with genuine Indian-made jewelry. I ensured that none of the Philippine-made jewelry was marked with its country of origin. I intentionally and personally represented that all of my Native American style jewelry was real Indian-made jewelry . . . .

Doc. 102 at 654.

Secondly, as described in the factual background section, the United States' investigation, including covert undercover buys from Ali and his employees, analysis of reams of financial records, and interviews of at least five of Ali's store employees, all revealed a consistent scheme to mix the genuine and fake Indian jewelry, represent all of it as real Indian jewelry, reference the Navajo and Zuni tribes, and reference a list of Native American-sounding names to match the initials and symbols stamped into each piece.

Finally, Ali marketed his stores—using mass-marketing—as specializing in Native American jewelry. In 2012, the *Albuquerque Journal* published a promotional Christmas gift guide that included the following information provided by Ali:

Navajo, pueblo jewelry

Also in Old Town, Galleria Azul and Gallery 8, both owned by Nael Ali, specialize in jewelry made by Navajo and pueblo artists. . . .

Ali works directly with artists and says everything in both store is made locally except for the amber jewelry, which is purchased from Poland. . . . A lot of his work is backed up with names of locally known jewelers, and everything comes with a lifetime warranty.

"We are all about the culture of this product and how it's made," Ali says. "People buy this because there's a name behind it, there's a style and the lifetime warranty that comes with it."

Employees, including Ali, have more than 28 combined years of experience working with jewelry. Galleria Azul and Gallery 8 also specialize in Native American pottery and artwork.

"I deal directly with the artists," says Ali. "There's no middle man for me. So, everything you see right here, the artists brought it to me, including the jewelry."

Manette Newbold, *Jewelry with a special touch – for him; Each local shop has its own flavor, for those looking for something unique*, Last-Minute Gift Guide, ALBUQ. J., Dec. 20, 2012, at 14.

## II.     THE COURT SHOULD INCREASE ALI'S SENTENCING GUIDELINE CALCULATION BY TWO ADDITIONAL LEVELS PURSUANT TO USSG § 2B1.1(b)(2)(A)

Pursuant to USSG § 2B1.1(b)(2)(A), the base offense level should be increased by two levels, if the offense "involved 10 or more victims," or "was committed through mass-marketing." Both of those criteria apply in this case. It is no great inference that Ali's fraudulent sales over nearly four years of displaying fraudulent Indian jewelry in Old Town Albuquerque that more than 10 people purchased Philippine-made jewelry believing it to be real Indian-made jewelry. The United States specifically identified four such victims that are referenced above during its investigation. Additionally, Ali's use of the Albuquerque Journal's gift guide to market his Old Town stores qualifies as mass marketing, which the Commentary defines as "a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to . . . purchase goods." USSG § 2B1.1, Commentary at 4(A).  The Albuquerque Journal reported 398,310 readers in the Fall of 2012. The Statistics Portal, https://www.statista.com/statistics/229542/readers-of-the-albuquerque-journal-aq-daily-edition/ (last visited May 4, 2018).

With that increase, Ali's offense level should be 17 after acceptance of responsibility, which corresponds to a sentencing guideline calculation of 24-30, given Ali's criminal history category of I.

### III.   ASSESSING DEFENDANT'S SENTENCE

Subsection 3553(a) of Title 18 identifies a litany of factors to be considered in imposing

sentence:

> The court, in determining the particular sentence to be imposed,
> shall consider—
>
> (1) the nature and circumstances of the offense and the history
> and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>    (A) to reflect the seriousness of the offense, to promote respect
> for the law, and to provide just punishment for the offense;
>
>    (B) to afford adequate deterrence to criminal conduct;
>
>    (C) to protect the public from further crimes of the defendant; and
>
>    (D) to provide the defendant with needed educational or vocational
> training, medical care, or other correctional treatment in the most
> effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for
> . . . the applicable category of offense committed by the applicable
> category of defendant as set forth in the guidelines . . . ;
>
> (5) any pertinent policy statement . . . issued by the Sentencing
> Commission . . . ;
>
> (6) the need to avoid unwarranted sentence disparities among defendants
> with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

### A.  The Kinds of Sentences Available and the Sentencing Range Established

The statutorily authorized penalties for the two-count Information to which Ali pleaded

guilty include: a term of imprisonment for a period of not more than 5 years; a fine not to exceed

$250,000; a term of supervised release of not more than one year to follow any term of

imprisonment; and a special penalty assessment of $100 for each count. As relayed above in the

19

factual section, the Sentencing Guidelines recommend Ali serve a term of incarceration within the range of 24 to 30 months.

**B.  The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense**

The crimes of conviction in this matter, violations of the Indian Arts and Crafts Act, in violation of 18 U.S.C. § 1159, target a long pattern of fraud that impacted the general public. Ali devised and carried out a scheme to deceive consumers. He did so repeatedly over the course of nearly four years. He used his employees to sell what they believed to be real Indian jewelry to unsuspecting customers. He placed them at risk for his own gain. More importantly, though, Ali's crimes have negatively impacted genuine Indian artisans. Ali and his stores formed part of a fraudulent industry designed to steal the cultural heritage of Native Americans for profit. Ali's conduct drove down prices for real Indian jewelry to a point where genuine Indian artisans could no longer compete. As a result, many abandoned the jewelry trade altogether, which had been passed down to them from their ancestors and which once supported their livelihood. Ali's case, therefore, represents a unique opportunity for this Court to send a message of deterrence to the people involved in this fraudulent industry, and to safeguard the viability of a genuine Indian art market.

**C.  The History and Characteristics of the Defendant**

Defendant Ali is 54 years old and is married with three children, two of whom are minors: one is 17 and the other 12. PSR ¶¶ 90, 99. He reports that growing up he had the "perfect life." PSR ¶ 93. He did not report exposure to any abuse or violence during his formative years. *Id.* Ali immigrated to the United States as a 19 year old, and graduated with an associate's degree in general engineering from a junior college in Colorado in 1985. Ali operates five separate businesses in Old Town Albuquerque. Most of them specialize in the sale of jewelry and art. One

specializes in the sale of "high quality vinegar and olive oil."

Ali's familial situation does warrant a variance in this case. Family circumstances are a discouraged factor under the guidelines, *see United States v. McClatchey*, 316 F.3d 1122, 1130 (10th Cir. 2003), and "are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." USSG § 5H1.6. Congress specifically directed the Sentencing Commission to "assure that the guidelines and policy statements, in recommending a term of imprisonment or length of a term of imprisonment, reflect the general inappropriateness of considering the education, vocational skills, employment record, family ties and responsibilities, and community ties of the defendant." 28 U.S.C. § 994(e); *see* USSG § 5H1.2 (policy statement) ("Educational and vocational skills are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range ...."); *id*. at § 5H1.5 (policy statement) ("Employment record is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."); *id*. at § 5H1.6 (policy statement) ("Family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted."); *id*. at § 5H1.11 (policy statement) ("Military, civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range.").

Under the law, Ali's upbringing and family bonds do not excuse or explain his criminal actions. Unlike many defendants, Ali was raised in a supportive household, he was not abused, and he did not become addicted to drugs. Instead, he graduated with an engineering degree from college. And yet, he has chosen to engage in long-term fraud, violate the laws of the United States, cheat his customers with lies and deception, and steal the cultural heritage of Native Americans for his own profit. Despite his admissions in his plea agreement and the solid

evidence the United States built against Ali, he comes to this Court minimizing his role and his intent, and attempting to deceive the Court. The Court should see Ali's claims for what they are: smoke and mirrors, designed to fool the Court. Ali deserves the punishment he has chosen eyes-wide-open—a sentence of 18 months.

### D.  The Need to Avoid Unwarranted Sentence Disparities

The United States asks for nothing more than for the Court to treat similarly situated defendants similarly. Fidelity to the guidelines is the most fair and transparent means of accomplishing the worthy end of consistent sentencing.

As this Court is well aware, the Sentencing Guidelines are advisory. *United States v. Booker*, 543 U.S. 220, 234 (2005). Taking into account the provisions of 18 U.S.C. § 3553, a reasonable sentence under *Booker* is one that reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence to criminal conduct, protects the public from further crimes of the defendant and provides the defendant with needed educational or vocational training, medical care or other correctional treatment.  18 U.S.C. § 3553(a)(2)(A), (B), (C), (D); *Booker*, 543 U.S. at 261-62.  A reasonable sentence also is one that "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6). Section 3553(a) continues to require sentencing judges to consider certain factors when imposing sentence, including "the kinds of sentence and the sentencing range established" by the Guidelines.  18 U.S.C. § 3553(a)(4). While no presumption of reasonableness attaches to a Guideline sentence in this Court, this Court may conclude that a Guideline sentence is a "rough approximation" of a sentence that would achieve the sentencing factors set forth in 18 U.S.C. § 3553(a)'s objectives. *United States v. Rita*, 551 U.S. 338, 350 (2007).

Ali's guideline range is reasonable. The Sentencing Commission recommends that Ali serve 24-30 months for his crimes. The PSR writer calculated Ali's recommended range at 18-24 months. And the United States asks this Court to impose a sentence of 18 months, which is the high-end of the 11(c)1(C) plea agreement the parties propose to the Court.

### E.  The Court Should Not Vary From the Advisory Guideline Range.

The Guidelines were conservatively calculated for Ali. He could have been given an additional six-level increase for the intended loss amount. He should be given two additional levels for the amount of victims and for using mass-marketing as a means to solicit customers at large. His calculated guideline range appropriately defines the sentence Ali has earned. He made a conscious choice every day for four years to make his living by cheating his customers and defrauding Native Americans. He made a conscious choice to stock his store with imported jewelry designed to look like genuine Indian jewelry. He made a choice to mix that jewelry and misrepresent it. He preyed on his hourly-wage employees to perpetuate his fraud. And he comes before this Court with more deception, instead of remorse. His choices have earned him a sentence—at the low end of the PSR guideline range—of 18 months.

Statistics reveal that white-collar criminals, like Ali, receive less severe sentences for their crimes, than violent criminals. *See* Gottschalk P, *Crime: the amount and disparity of sentencing-a comparison of corporate and occupational white collar criminals*, Int'l J. of Law, Crime & Justice 42(3) at 175-187 (2014). And yet, white-collar criminals recidivate at higher rates. Fredericks Katie, et al., *White Collar Crime: Recidivism, Deterrence, and Social Impact*, Forens. Res. Cim. Int'l J. 2(1) at 39 (2016). Deterrence theory states that the swiftness, severity, and certainty of punishment will deter criminals. Siegel LJ, Criminology: the core at 512 (1997 4th Ed.). A recent exhaustive study that analyzed white-collar sentencing data and recidivism

rates against violent crime data recommends, "more sever punishments" of white collar crime to improve "deterrence methods and decrease recidivism." Fredericks Katie, et al., White Collar Crime: Recidivism, Deterrence, and Social Impact, Forens. Res. & Crim. Int'l J. 2(1) at 10-11 (2016).

Any variance from the guidelines in this case will embolden white collar criminals to continue their criminal schemes. White-collar criminals, like Ali, are typically college educated, sophisticated professionals or businessmen. They carefully calculate the risks of their enterprise. A variance in this case, especially one to a probated sentences as Ali requests, will encourage fraudsters to continue or enter into the fraudulent Indian jewelry business. That is more true here than in cases involving professional licensure, which may be lost simply by the filing of a federal felony conviction. Where a professional license is used as the means of fraud, the loss of the license should have a sufficient deterrent effect. But in this industry where you can start a jewelry business at your whim, if you can make millions in exchange for the risk of probation, the benefit-risk analysis tempts the morally compromised. But if this Court imposes an 18-month sentence, it will send a real deterrent message to the Ali's of this industry. And it will send a very specific message to Ali that he should never use fraud as a means to profit from his current and future businesses. Most importantly, it will serve to safeguard real Native American artists, their industry, the treasures they create, and the livelihoods to which they should be entitled.

IV.   CONCLUSION

Based upon the aforementioned authorities and arguments, the United States requests that this Court accept the presentence report's calculations. The United States also requests that this Court sentence Defendant Ali at the low-end of the guideline range to 18 months. A variance from the Sentencing Guidelines sentencing range in this case would not send a sufficient

message of deterrence, would not safeguard our Native American communities, would not promote respect for the law, or provide a just punishment for Ali's offenses. Conversely, a sentence of 18 months, at the low end of the guideline range, would be consistent with all of the considerations delineated in § 3553(a) and would be sufficient, but not greater than necessary, to accomplish the objectives set forth in that statute.

RESPECTFULLY SUBMITTED this 4th day of May 2018.

JOHN C. ANDERSON,
United States Attorney


_____/s/_____
Kristopher N. Houghton and
Sean J. Sullivan
Assistant United States Attorneys
United States Attorney's Office
201 Third NW, Suite 900
Albuquerque, NM 87102
(505) 346-7274


CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2018, I filed the foregoing document electronically through the CM/ECF system.  Pursuant to the CM/ECF Administrative Procedures Manual, §§ 1(a), 7(b)(2), such filing is the equivalent of service on parties of record.


_____/s/_____
Kristopher N. Houghton
Assistant United States Attorney